UNITED STATES v. GREENE et al.

(District Court, S. D. Georgia, E. D. January 12, 1906.)

No. 371.

1. EXTRADITION—CONSTRUCTION OF TREATY.

In the construction and carrying out of extradition treaties the ordinary technicalities of criminal proceedings are applicable only to a limited extent, since an exact correspondence between the laws of the two countries cannot be expected, and the. only purpose of extradition is to put the accused on trial under the laws of his own country.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Extradition, § 9.]

2. SAME—SUFFICIENCY OF INDICTMENT—DESCRIPTION OF OFFENSE.

An indictment charging a conspiracy to defraud the United States between an officer and agent of the government and his codefendants, which sets out facts showing a corrupt agreement between the defendants and overt acts by means of which the purpose of such agreement was effected and the government defrauded, charges fraud by an agent and participation therein by the other defendants, within the meaning of clauses 4 and 10 of article 1 of the extradition treaty of 1890 (Act March 25, 1890, 26 Stat. 1509) between Great Britain and the United States, and is sufficient to warrant their extradition for trial thereunder.

3. SAME—CONSTRUCTION OF TREATY.

Distinction between relating clause of the Ashburton treaty of 1842 and the supplemental treaty of March 25, 1890, now of force. discussed.

4. SAME—INDICTMENT.

For the purposes of determining a question like this, the indictment must be construed, not by one generic description alone, but after full consideration of all its clear and substantial averments.

Indictment for Conspiracy to Defraud the United States by Presenting False Claims, etc. On pleas of Benjamin D. Greene and John F. Gaynor.

See 115 Fed. 343.

Marion Erwin, U. S. Atty., Samuel B. Adams and Thomas F. Barr, Sp. Assts. to U. S. Atty., and Alexander Akerman, Asst. U. S. Atty.

William Garrard, Peter W. Meldrim, William W. Osborne, and Alexander A. Lawrence, for defendants.

SPEER, District Judge. The court has heard the questions presented on the plea of the defendants Benjamin D. Greene and John F. Gaynor to indictment No. 371, and the answer filed by the government's counsel thereto. The argument of counsel has been exhaustive.

The plea alleges that the court is without jurisdiction for the reasons therein stated. They are that the defendants were lately under

the sovereignty of the United Kingdom of Great Britain and Ireland, and that, under the treaty and under extradition proceedings between this government and that of Great Britain, the defendants were extradited to be tried upon the charges: First, participation in fraud by an agent and trustee; second, participation in embezzlement; and, third, for receiving money and property, knowing the same to have been fraudulently obtained. It is alleged that none of the aforesaid crimes or offenses are charged in the bill of indictment in any of its counts, and that no crime is charged in said indictment for which extradition can be asked. Elaborating this ground of defense it is alleged that the court has no authority to try the defendants for any crime or offense other than those named and defined in the extradition treaty, and, further, that the court has no authority to try the defendants for any crime or offense other than those for which they have been extradited. Whereupon, defendants object to being called upon to plead to said indictment, and pray that they be not tried thereon, and that they may be discharged from custody.

The answer of the government admitting the grounds of extradition to be as alleged by the plea, denies that there is a failure to charge the appropriate crimes or offenses for which such extradition was had. On the contrary, it answers that each count of the indictment charges both defendants with participation in the fraud alleged to have been practiced upon the government by one of its agents and trustees. It alleges also that the judgment of the extradition judge in the Dominion of Canada specifically sets forth that the particular acts which are charged in the indictment No. 371 were committed by the defendants and constitute participation on their part in the fraud alleged. The answer also denies the averment of the plea that the crimes and offenses set out in the indictment are not named in the extradition treaty and are therefore not extraditable. The answer of the government further alleges that the defendants were extradited and surrendered for the crimes and offenses set out described and charged in the first, second, third, fourth, fifth, and sixth counts of the indictment, and that the court has full jurisdiction to proceed with the trial.

From a certified copy of the judgment of Ulric Lafontaine, extradition commissioner of the Dominion of Canada, the grounds upon which the prisoners were returned for trial are clearly discoverable. They are: First. By entering into a corrupt agreement (conspiracy) with Oberlin M. Carter, an officer and agent of the United States, to defraud the United States in the discharge of the duties of his office and employment, and for payment by him as such officer and agent, of the public moneys intrusted to him, fraudulent claims made and to be made against the United States for the benefit of Carter and the defendants here; that such fraudulent claims were presented to Carter as a disbursing officer for approval and payment; that this constituted a corrupt agreement and deceitful device by which Carter transferred the exercise of the discretions of his office and the service of his employment from the United States, his principal and employer, to the prisoners, so that the United States thereby lost what it was entitled

to have, the honest and faithful services of its officer and agent. Second. By jointly with said Carter, agent and trustee as aforesaid, causing to be made and presented to him fraudulent claims against the government for his approval and payment to the amount of $575,749.90 knowing the same to be fraudulent. The third and fourth grounds charging embezzlement and receiving money embezzled are not important for consideration on this issue.

The treaty itself was designed to enlarge the Ashburton treaty of 1842, which, if I am accurate in my recollection, was negotiated by Mr. Webster, then Secretary of State, and Lord Ashburton. At the time that treaty was under consideration there was great tension between Great Britain and our own government, with several threatening causes of dispute—among these the dispute as to the boundaries between the United States and Canada and the final suppression of the African slave trade. An interesting résumé of these historical facts may be found in the Life of Daniel Webster written by Mr. Curtis, one of his literary executors. In later years the entente cordiale between these two great branches of the Anglo-Saxon race has steadily strengthened, and is in this day second to no other as a guaranty for the preservation of civil and religious liberty in all that vast domain where the sun, in each diurnal progress around the world, is simultaneously greeted by the meteor flag of the mother country and the stars and stripes. The influence of this feeling doubtless contributed to the supplemental convention for extradition which controls the question now before the court. The purpose of the treaty is indicated by the following provision of the preamble:

"And whereas it is now desired by the high contracting parties that the provisions of said article should embrace certain crimes not therein specified and should extend to fugitives convicted of the crimes specified in said article and in this convention."

We find that the original treaty was supplemented by three additional clauses which are strongly illustrative of the subject now under consideration. The third and fourth clauses of article 1 comprehend:

"(3) Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulenty obtained.

"(4) Fraud by a bailee, banker, agent, factor, trustee, or director or member or officer of any company, made criminal by the laws of both countries."
26 Stat. 1509.

The second clause of paragraph 10 of the same article provides as follows:

"Extradition is also to take place for participation in any of the crimes mentioned in this convention or in the aforesaid tenth article provided such participation be punishable by the laws of both countries."
26 Stat. 1509.

Construing the Ashburton treaty in Rauscher's Case, 119 U. S. 420, 7 Sup. Ct. 234, 30 L. Ed. 425, the Supreme Court comments upon the enumeration of offenses and declares that they are so specific and marked by such a clear line in regard to magnitude and importance that it is impossible to give any other interpretation to it than that of

the exclusion of the right of extradition for any others. In the older treaty the pertinent language of the caption of the treaty was for the giving up of criminal fugitives from justice in certain cases. There were only seven crimes enumerated. In the later treaty extradition, as we have seen, is to take place, not only for the crimes which are largely multiplied, but also for participation in any of the crimes therein mentioned. It is not surprising that, construing the earlier treaty, Mr. Justice Miller in Rauscher's Case, after reviewing the authorities declared that a person who has been brought within the jurisdiction of the court by virtue of the proceedings under an extradition treaty can only be tried for one of the offenses described in that treaty. It is obligatory upon the court in the application of this language to look carefully to the phraseology and purpose of the treaty the Supreme Court is construing. When, however, a subsequent treaty, equally binding upon the judicial officers of both countries, authorizes extradition not only for the specific crime mentioned but for participation in it, and when such facts constitute a penal offense under the laws of both sovereignties and the determination of whether the facts set out in the proceedings for extradition and in the indictment found in the trial court on the same facts constitute such a participation is a matter to be determined according to the jurisprudence and practice of the country where the prisoners are indicted and to which they have been returned.

The treaty now effective was adopted in 1890, and the view we state above may, we think, be regarded as confirmed by the language of the court in Bryant v. U. S. (decided in 1896) 167 U. S. 104, 17 Sup. Ct. 744, 42 L. Ed. 94. This was a case of extradition by the British government from American Territory. The prisoner was charged with the crimes of forgery, larceny, embezzlement, and false entries committed in the city of London. The extradition was attempted under article 10 of the treaty of November 10, 1842 (8 Stat. 576), and article 1, of the treaty supplemental thereto of March 25, 1890 (26 Stat. 1508). These are the precise principles of the treaty which are now under consideration. It will be observed that there was a charge of forgery of three checks, and it was insisted that, because the prisoner made false entries upon the books of Morrison and Marshall, this would not constitute an offense for which he could be extradited because, when the treaty of 1842 was executed, the making of false entries was not forgery, and that further as to the charge of embezzlement there was no evidence of criminality, and that if there was evidence sufficient to hold appellant upon the charge of forgery, he could not be held as for larceny or embezzlement, and that if he were held for embezzlement he could not also be held for obtaining the money upon forged checks, that as he could only be tried for the particular offense for which he is surrendered, the demanding government and the commissioner should have elected, and if the latter deemed the evidence sufficient to commit upon the one charge he should not have been committed upon the other. The court, through Mr. Justice Brown, made this significant remark:

146 F.—49

"So long as the prisoner is tried upon the facts which appeared in evidence before the commissioner, and upon the charges or one of the charges for which he is surrendered, it is immaterial whether the indictment against him shall contain counts for forgery, larceny, or embezzlement. While the treaty of 1842 authorized surrender only for the crime of forgery, or utterance of forged paper, the supplemental treaty of March 25, 1890, included both embezzlement and larceny."

It is, perhaps, not quite safe, therefore, in the practical administration of justice to be guided exclusively by precedents established when the treaty making nations were ever en garde the one toward the other. This is happily expressed in the brief of Mr. Solicitor General Hoyt and Mr. Assistant Attorney General Purdy in Wright v. Henkle, 190 U. S., at page 55:

"As confidence between nations has grown, the liberal view of extradition treaties as effectuating common and proper purposes emphasizes the broad, essential correspondencies, and minor technical distinctions and mere designations have less weight. Bryant's Case, supra; Grin v. Shine, 187 U. S. 181, 23 Sup. Ct. 98, 47 L. Ed. 130.

They add on page 56 that:

"Provided the particular variety is criminal in both jurisdictions, exact correspondence is not necessary. The essence and substance are to be regarded, and highly technical considerations fall away."

And reciting, on page 60 of 190 U. S., page 785 of 23 Sup. Ct. (47 L. Ed. 948), the interesting fact that the treaty we have under consideration was made by Mr. Secretary Blaine and that accomplished lawyer and publicist, then Sir Julian Pauncefote, the Chief Justice declares:

"Where there was reason to doubt whether the generic term embraced a particular variety, specific language was used. As for instance, as to the slave trade, though criminal, yet, apparently because there had been peculiar local aspects, the crime was required to be 'against the laws of both countries'; and so as to fraud and breach of trust, which had been brought within the grasp of criminal law in comparatively recent times."

"It is enough," continues the Chief Justice, "if the particular variety was criminal in both jurisdictions and the laws of both countries included the laws of their component parts." This view seems to have impressed the Chief Justice who rendered the opinion for the unanimous court in Wright v. Henkel, supra. "Treaties," said he, "must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose. The ordinary technicalities of criminal proceedings are applicable to proceedings in extradition only to a limited extent." Chief Justice Fuller continued:

"The general principle of international law is that in all cases of extradition the act done on account of which extradition is demanded must be considered as a crime by both parties, and as to the offense charged in this case, the treaty of 1889 embodies that principle in terms. The offense must be 'made criminal by the laws of both countries.'"

It must be remembered that the treaty under consideration is sometimes called the treaty of 1889 and sometimes the treaty of 1890. This is due to the fact that it was negotiated in one year and put in

operation by the proclamation of the President the next year. The thought is further amplified in the observations of Mr. Justice Brown, in Grin v. Shine, 187 U. S. 184, 23 Sup. Ct. 98, 47 L. Ed. 130. Said that learned justice:

"There is such a general acknowledgement of the necessity of such treaties, that of late, and since the facilities for the escape of criminals have so greatly increased, most of the civilized powers have entered into conventions for the mutual surrender of persons charged with the most serious nonpolitical crimes. * * * In the construction and carrying out of such treaties the ordinary technicalities of criminal proceedings are applicable only to a limited extent. Foreign powers are not expected to be versed in the niceties of our criminal law, and proceedings for surrender are not such as put in issue the life or liberty of the accused. They simply demand of him that he shall do what all citizens are required and ought to be willing to do, viz., submit themselves to the laws of their country."

It is insisted, however, that notwithstanding the essential facts constituting an offense criminal in both countries are fully recited in the indictment and as fully placed before the commissioner of extradition as appears from his judgment, we have no jurisdiction to try these prisoners because in some of the counts the aggregated facts thus denounced by law are by the pleader termed a conspiracy. It is further urged that conspiracy is not specifically extraditable under the supplemental treaty or under any treaty with Great Britain, and therefore the prisoners must be discharged and permitted to go hence without a day.

In view of the grave consequence of the offenses charged, this proposition is startling to all who consider the right of the people to have issues like this tried upon the merits and the guilt or innocence of the parties determined by the evidence. The court will not lightly or without anxious inquiry dispose of an issue of such magnitude. For years the government has been attempting to bring to the bar of public justice the men whom successive grand juries have indicted for alleged violation of its laws, and alleged misappropriation of enormous sums appropriated by the liberality of Congress for the benefit of this city, of the Georgia sea coast, and the mighty values involved in the transportation by water of the interstate and foreign commerce of our country. On the other hand the rights of an individual in the orderly administration of justice are not less sacred, not less to be carefully conserved by the courts than the rights of the public in so far as they may be properly involved. The court has therefore listened attentively, and carefully considered the exhaustive arguments of counsel. Undoubtedly it will not be forgotten that, under what I have long believed a most unfair and unrighteous discrimination in the law, the government, representative of the people, has no appeal from the decision of a court of this character however technical or erroneous, and however completely it may nullify the purpose for which criminal laws were enacted. On the other hand the accused is given the right of appeal and exception on every judgment made, and in many instances the right of reiterated appeals. For this additional reason the court should exercise the utmost care and circumspection before it will turn the government out of court. If, then, there are

fair grounds supported by reasonable considerations, whether by precedent or not, which will adequately secure to the prisoners a fair trial and a righteous determination, such ·defenses as that upon which the prisoners rely will be discouraged unless a different course is obligatory. If his substantial constitutional and legal rights can obviously be protected, if no harm can come to him by maintaining the indictment, the right of the public to present its side of the case on the facts should not be denied. If the accusation of crime made by the constitutional inquest, the grand jury, is supported by adequate proof which, in the absence of contradiction, will justify conviction of guilt there is also the equal right of the public to hear the evidence and the merits of the prisoner's defense. This is fundamental law in its evolution made every day more and more applicable by the increasing demands for protection for our increasing interests and our marvellous civilization. Besides in the issue of this character the prisoner is the movant, the burden is upon him to assail and maintain his assault against the presumably orderly and regular proceedings directed by the governmental authority. "Omnia præsumuntur rite et soleniter esse acta."

It is true that the government of the United States in its efforts to secure the return of the prisoners for trial was for a time confounded by the erroneous judgment of a local Canadian judge. This conduct has been condemned by the highest judicial authority intrusted with appropriate jurisdiction in that mighty empire to which the Dominion of Canada is subject. I mean the privy council of his majesty King Edward VII. It is also true that an extradition commissioner expressly intrusted by Canadian law with the decision of the matters involved, after hearing all that the government of the United States advanced or the prisoners cared to submit, made his judgment of extradition upon the substantial charges presented by the United States. More than this on habeas corpus proceedings instituted by the prisoners as they had the right to do, a judge of the King's Bench in Canada affirmed the action of the commissioner of extradition. The requisition of the President of the United States was made. The prisoners have been restored to the jurisdiction from which they fled. It may be added that another Canadian judge had previously maintained the rights of our government to the extradition of these men. Then it is true that two judges of that Dominion have sanctioned this extradition upon a complaint setting forth the essential grounds set forth in the indictment, and the august tribunal presided over by the Lord Chancellor sitting in those mighty halls of justice in that

"Land of old and great renown
Where Freedom broadens slowly down
From precedent to precedent,"

have upheld the authority of those two judges to finally pass upon the questions, and their judgments have upheld the dignity and majesty of American law and the comity which should exist between the two great English-speaking nations who have taken the lead in all the

paths of civilization in every effort made by government for the protection of life, liberty, and property.

It is said that to uphold this indictment would be a reflection upon the national honor, but in view of this action of all the courts of Great Britain and the ample sufficiency of these indictments, it will appear, I think, that to annul them would seem a reflection upon the national intelligence. Why, then, is the court asked at one stroke to hew down the arm of justice as it would hold the scales in equal poise between the government and the accused?

The whole contention of the accused may be summarized in a single sentence. The indictment charges conspiracy, and the prisoners were returned to the bar of this court for something else. It is further charged that the prisoners are put on trial for crimes other than those for which the extradition was granted. As we have previously seen, generic terms were utilized by the great diplomatists and lawyers who drafted this treaty wherever it was deemed that specific language was not adequate. The purpose was to accomplish extradition and the trial on the merits which should follow. Fraud by an agent or trustee, and participation in extraditable crimes are illustrations of this character. The treaty does not attempt to define all of the definitions of crime which may be adopted by the Legislatures of the respective countries. It classifies topics and elements of crime in generic phraseology leaving for the respective governments the duty of framing its legislation so as to definitely denounce any and all injurious action embraced in the more comprehensive language of the treaty, to provide procedure for the trial and penalties upon conviction. How multiplied might be the instances of fraud in the United States and in the several states which might be expressed by the term fraud by an agent or trustee. Larceny after trust, embezzlement, making false entries to mislead and cover up the traces of guilt, the looting of a bank by its officers and the like. Indeed, innumerable are the instances of criminal fraud which have been or may be defined either by the Congress or by the Legislatures of the several states, under each of these extradition clauses. Nor does it seem to me of consequence that the pleader has denominated what is actual criminal fraud of this class which is extraditable under a definition of crime which is not extraditable. An indictment is to be construed, not by the name with which it is christened, but by the crime which it actually truly and fully sets forth in the averments of fact. If, then, it should appear that the pleader in this case termed as a conspiracy, a gigantic scheme to defraud the United States of hundreds of thousands of dollars, a scheme which in its substance and essence is made penal by the statute, which is made penal also by the criminal laws of Canada, if the averments are full, circumstantial, complete, putting the prisoner on notice of all the proof which the government intends to offer against him; if, in other words, it is an adequate description of joint participation in a gigantic fraud accomplished by a trusted agent of the government of the United States, how is anybody hurt because along with all this fullness of averment, this completeness of notice and information of the character of the offense charged, the pleader also terms it a conspiracy?

The ruling of this court in United States v. Greene (D. C.) 115 Fed. 344, on the demurrer to a similar indictment, has been cited as authority to support the plea of the defendant. It is urged that the court reiterated the word conspiracy as a designation for the offense, but the fact should not be disregarded that along with this expression was the fullest and most circumstantial detail of the facts, which were set out in the indictment, which were adopted by all the British and Canadian courts which passed on this question, which brought about extradition, and which gave information to the prisoners of the character of the charge against them and which must be proven substantially before the government can expect a verdict of conviction. It was described, not merely as a conspiracy, but as a joint and successful endeavor to defraud the United States by participation in the crime of its trusted agent and officer. Indeed, so copious were the specifications of fraud that the court, as appears from the passage following, felt obliged to condense the language used by the pleader:

"As such officer in charge of said Savannah district, he was vested with sundry powers, duties, and discretion during said period, and, amongst other things, with power in devising and drafting from time to time specifications for contracts for the improvements proposed to be made in said district; in drafting and suggesting forms of advertisements for giving notice to the public that competitive bids would be received by him; in fixing the time such advertisements would be published prior to the opening of bids; in suggesting and causing to be fixed and fixing the time designated in specifications for contracts within which the successful bidder would be required to commence work; in giving out information in regard to such contracts to be let; in receiving proposals for and recommending the awarding of such contracts, and in approving or rejecting the bonds required to be given by such contractors; in superintending the work to be done by such contractors in said district; in approving and accepting or rejecting the work done by such contractors, according as the same was in accordance with the requirements of such contracts or not; in suggesting and approving modifications of such contracts; in approving or rejecting the accounts rendered to him by such contractors for work done or claimed by such contractors to be done by them, according as said accounts should be fair and honest or false and fraudulent and, when in funds, as a disbursing officer, with power, duty, and discretion in paying such contractors or refusing to pay such contractors the amounts claimed by them to be due for work done according as such claims were honest and fair or false and fraudulent."

Similar or rather identical averments appear in the present indictment. Among these contractors were the prisoners. "From this statement," the court continued, "it will be seen that it was in the power of the engineer officer, provided his mind met in illegal conspiracy with the others charged, to do what it is charged that they all did; in short, to control all of the government contracts through a series of years, for the expenditure of appropriations of the public money for the rivers and harbors of this district, to have that work done in a cheap and inexpensive manner, to charge the government a great price for such services, and to divide the excess of illegal gain above the necessary expenditure between the conspirators." It is true we adopted the language of the pleader. The court throughout used the word "conspiracy," but always the impartial or observant mind will discover in connection with it the purpose to defraud the United States by the seduction of its agent, by the joint action that met in the

plot and the joint distribution of the profits. This I mean as alleged in the indictment. More than one crime is thus fully described in the indictment, and on more than one crime are the defendants extradited, and of all such crimes it may be said that they are criminal in this country and in the Dominion of Canada.

Further elaboration is unnecessary. "It is not true," said the court, "in an indictment of this character as contended by the counsel for the accused that each count must be treated as a complete and separate indictment in itself. On the contrary if counts which, considered separately, would not be regarded as complete, are perfected by apt reference to averments in other counts so that there is intelligible and definite information conveyed to the accused of the accusation against them, the constitutional requirement as to an indictment is met." All of the counts of the indictment were sustained except the ninth and tenth. To these the defendants demurred on the ground that the fraudulent character of the claim was not sufficiently set forth. The counts failed to disclose the means or details by which the conspiracies charged were to be made effective and although the charge of conspiracy was made in the language of the statute, because the pleader used merely general expressions and did not state the specific facts of fraud which he intended to prove, these counts were quashed in favor of the prisoners. The indictment now under consideration was soon returned by the grand jury in order that the accused might be furnished with information which the court held that they were entitled to have.

The conclusion of the court is as follows: That each of the first four counts of this indictment charges a corrupt agreement and conspiracy to defraud the United States on the part of a trusted officer and agent of the government; and further that the object of this conspiracy was sought to be effected by the overt acts therein charged; that by this corrupt agreement the officer and agent is charged with having in effect transferred and prostituted the exercise of the discretions of his office and the services of his employment from the United States his principal and employer to his co-conspirators; that such corrupt agreement constituted in itself fraud by an agent within the meaning of the fourth clause of the treaty; that the defendants Benjamin D. Greene and John F. Gaynor, charged in the indictment as co-conspirators and parties to that corrupt agreement, are charged with participation in the fraud of such agent.

We further conclude that in the last two counts of the indictment the defendants Benjamin D. Greene and John F. Gaynor are charged jointly with Oberlin M. Carter, engineer officer and agent of the government, with having knowingly caused to be presented to the officer and agent for his approval and payment the fraudulent claims described; that this constitutes a charge of fraud on the part of the officer and agent and participation in that fraud by the defendants Benjamin D. Greene and John F. Gaynor. It was precisely for the offenses thus charged that the defendants were committed for surrender to the United States by the judicial authorities of Canada.

Our conclusion, then, is that the extradition was amply authorized

by the treaty; that the prisoners were extradited for alleged crimes indictable in both countries; that the language of the present indictment is, in all substantial respects, adequate to secure their constitutional rights to full information of all the charges against them, and to accord them a fair and righteous trial so far as the indictment goes.

It follows that the plea must be overruled and disallowed.