## GREENE et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. June 3, 1907.)

No. 1,601.

1. EXTRADITION—TRIAL OF ACCUSED AFTER EXTRADITION—IDENTITY OF OFFENSE CHARGED.

While the extradition of a person from a foreign country for trial in the United States and the indictment on which he is tried must be for the same criminal acts, it does not follow that the crime must have the same name in both countries, but it is sufficient if the acts in question are criminal in both countries and are within the terms of the treaty under which the extradition is granted.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Extradition, § 23.]

2. SAME—TREATY WITH GREAT BRITAIN.

Persons surrendered by Canada to the United States, under sections 4 and 10 of article 1 of the extradition treaty of 1890 between Great Britain and the United States, to be tried for the crime of "participation in fraud by an agent or trustee," were tried for such crime where the indictment charged them with conspiracy with a disbursing officer of the government to defraud the United States by presenting false and fraudulent claims to such officer and by his allowance and payment of the same from public money in his hands, the acts and transactions charged and proved before the extradition commissioner and under the indictment being the same.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Extradition, § 23.]

3. SAME—OFFENSES WITHIN PROVISIONS OF TREATY—FINALITY OF DECISION OF COUNTRY ON WHICH DEMAND IS MADE.

The question whether or not a fugitive shall be surrendered by a country in which he has sought asylum must of necessity be decided by the government of such country, and its decision, approved by its courts, that the offense charged is within the terms of an extradition treaty between that country and the one making the demand, is final, and the question cannot be again raised in the courts of the latter country after extradition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Extradition, §§ 15, 20.

Fugitives from justice under extradition laws, see notes to In re Strauss, 63 C. C. A. 104.]

4. SAME—RIGHTS OF ACCUSED AFTER EXTRADITION.

As to offenses not covered by an extradition treaty between two countries, they stand toward each other as though there were no treaty, and either may exercise its discretion as to the surrender of a fugitive on demand of the other; and where such a demand has been acceded to, either under the obligation of a treaty or as an act of comity, the accused is triable in the courts of the country to which he is returned on the charge upon which he was surrendered.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Extradition, § 23.]

5. CRIMINAL LAW—REVIEW OF JUDGMENT BY APPELLATE COURT—SUFFICIENCY OF INDICTMENT.

A general judgment upon an indictment containing several counts and a verdict of guilty on each count cannot be reversed if any count is good and is sufficient to support the judgment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 2098–2100.]

6. INDICTMENT—LIMITATIONS—PLEADING—GROUND FOR DEMURRER.

The defense of the statute of limitations cannot be made by demurrer to an indictment.

154 F.—26

7. CRIMINAL LAW—LIMITATIONS—PERSON FLEEING FROM JUSTICE.

    To constitute one a "person fleeing from justice" so as to prevent the running of the statute of limitations against a prosecution for a criminal offense against the United States under Rev. St. § 1045 [U. S. Comp. St. 1901, p. 726], it is not necessary that he should have left the United States, but it is sufficient that he had left the district in which the offense was committed when it was sought to apprehend him therefor, and was found in another district in which he did not reside under circumstances indicating a purpose to evade the authority of the court having jurisdiction.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 278.]

8. SAME—PROCEEDINGS IN ERROR—REVIEW OF INSTRUCTIONS.

    In the federal courts no instruction to the jury given or refused by the trial court can be brought before an appellate court for review by writ of error, unless the record shows that an exception was taken to the giving or refusal of such instruction while the jury were at the bar; and the trial court is without authority to dispense with such rule by any rule or order extending the time for filing exceptions.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 2670; vol. 14, Criminal Law, § 2022.]

    Pardee, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of Georgia.

For opinion below, see 146 Fed. 803.

Wm. Garrard, P. W. Meldrin, W. W. Osborne, and A. A. Lawrence, for plaintiffs in error.

Marion Erwin, U. S. Dist. Atty. (Henry M. Hoyt, Sol. Gen., on the brief).

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. A brief statement of the case must be made, to be supplemented later by a fuller statement of the issues and facts pertinent to each contention considered and decided.

In the court below four indictments were found against the plaintiffs in error, Benjamin D. Greene and John F. Gaynor, who will hereafter be called the "defendants." One of the indictments, No. 477, was dismissed, and need not be mentioned again. In two of the remaining cases the defendants were jointly indicted with Oberlin M. Carter, a captain in the Corps of Engineers of the United States Army, who, before the finding of the indictment, had been in charge of the river and harbor improvements in the Savannah, Ga., district, and, while so employed as an officer and agent of the United States, had large sums of money placed in his hands and under his control for disbursement. The several counts of the three indictments all relate to money of the government which passed into his hands and under his control as an officer and agent of the United States. Each of the counts contain charges of the successful conspiracies of the defendants to fraudulently obtain possession of these funds, the presentation of false and fraudulent claims for payment out of them, or for the embezzlement of $575,749.90 of such funds. On motion of the United States attorney, the indictments were consolidated. Rev. St. § 1024 [U. S. Comp. St. 1901, p. 720], 146 Fed. 781. The defendants were

tried on the three indictments so consolidated. Indictment No. 322, hereafter called the first indictment, contains, as numbered thereon, 10 counts. The last two counts were stricken out, and the defendants were put to trial on the remaining counts numbered from 1 to 8, inclusive, which charged violations of Rev. St. §§ 5438 and 5440. Indictment No. 371, hereafter called the second indictment, was evidently framed to cover the same offenses charged in the first indictment. The charges in the second indictment are made more elaborately, and apparently with the purpose of meeting objections which had been made to the first indictment. It contains six counts, four for violations of Rev. St. § 5440, and two for offenses under Rev. St. § 5438. Indictment No. 476, the third indictment, contains four counts, each charging embezzlement. Rev. St. §§ 5497, 5488. After the court had disposed of preliminary questions, the defendants pleaded "not guilty" to these several charges. The jury found the defendants "guilty as charged" in all of the 18 counts submitted to them. By the judgment entered on the verdict, each of the defendants was sentenced (a) on the counts of the first and second indictments, held to be under the provisions of section 5440, Rev. St., to two years' imprisonment in the United States penitentiary at Atlanta, Ga., and to pay a fine of $10,000; (b) on the counts of the second indictment, held to be under the provisions of section 5438, Rev. St., to four years' imprisonment in the United States penitentiary at Atlanta, Ga.; (c) on the third indictment, held to be under sections 5488 and 5497, Rev. St., to four years' imprisonment in the United States penitentiary at Atlanta, Ga., and to pay a fine of $575,749.90, that being the amount alleged to have been embezzled. The several terms of imprisonment run concurrently, and begin at the date when the prisoners should be received by the warden of the penitentiary.

The defendants were extradited from Canada under the treaty of 1889–90 between the United States and Great Britain. We copy here parts of the treaty to which reference is necessary:

"The provisions of the said 10th article (of the treaty of 1842) are hereby made applicable to the following additional crimes:  *  *  *

"(3) Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained.

"(4) Fraud by bailee, banker, agent, factor, trustee, or director or member or officer of any company, made criminal by the laws of both countries.
*   *   *

"Extradition is also to take place for participation in any of the crimes mentioned in this convention or in the aforesaid 10th article, provided such participation be punishable by the laws of both countries.  *  *  *

"No person surrendered by or to either of the high contracting parties shall be triable or be tried for any crime or offense, committed prior to his extradition, other than the offense for which he was surrendered, until he shall have had an opportunity of returning to the country from which he was surrendered." 26 Stat. 1508.

The defendants presented certain defenses to the first and second indictments, which related to their extradition. These defenses had no application to the third indictment. The defenses were presented by pleas, which, so far as is necessary to state, were, in substance, that they had lately been in the Dominion of Canada and had been surren-

dered to the United States to be tried for "participation in fraud by an agent or trustee" and "participation in embezzlement," and that neither of these offenses is charged by the two indictments to which the pleas were addressed, and that the court had no right or authority to try them for any crime or offense for which they were not extradited. The government answered the pleas, admitting that the defendants were extradited for the offenses stated in the pleas, and averring that the indictments charged them with the offenses for which they had been extradited. The third indictment was not involved in these contentions, for it clearly charged embezzlement, and the extradition admittedly included that offense. By consent of counsel, the issues raised by these pleas to the first and second indictments were tried by the court. The United States offered in evidence the opinion of the Extradition Commissioner awarding their surrender; the judgment of the Privy Council; the judgment of the Court of King's Bench for Lower Canada on mandamus proceedings; habeas corpus proceedings instituted by Benjamin D. Greene and John F. Gaynor before Mr. Justice Ouimet, of the Court of King's Bench for Lower Canada, and Mr. Justice Ouimet's opinion and judgment sustaining the extradition; the requisition for surrender made by the American Secretary of State on the British Ambassador; the President's warrant to George F. White and Joseph F. Doyle to receive Benjamin D. Greene and John F. Gaynor from the Canadian authorities and deliver them to the proper authorities in the United States; George F. White's return on bench warrants; and the President's warrant showing the return of the defendants, Benjamin D. Greene and John F. Gaynor, before the District Court at Savannah on October 9, 1905. No other evidence was offered. The court overruled the pleas, and to this ruling the defendants excepted.

The first question raised by these pleas is: Do the first and second indictments charge an offense for which the defendants were extradited? This question must be answered by a comparison of the extradition proceedings and warrant with the indictments. The formal statement in the pleas admitted in the answers is that the defendants were surrendered to be tried for (1) "participation in fraud by an agent or trustee"; (2) "participation in embezzlement." The question here relates to the first charge, the charge of embezzlement appearing only in the third indictment. The words used are taken from the treaty as general descriptions of certain crimes that are made extraditable. The particular crimes or criminal acts that the Canadian government had in view when it surrendered the defendants to be tried for "participation in fraud by an agent or trustee" can be ascertained by considering the demand that had been made on that government and the evidence that was submitted to it by the United States to sustain such demand, and, especially, the judgment or order of the Extradition Commissioner upon which the warrant of extradition was based. The demand of the United States was made on the charge, among others, that the defendants had entered into corrupt agreements with Oberlin M. Carter to defraud the United States out of large sums of money held by Carter as the agent of the United States. The facts were placed fully before the Canadian authorities substan-

tially as they were subsequently presented to the jury on the trial of the defendants. On such demand and upon such evidence the judgment or order of the Extradition Commissioner was rendered. A brief excerpt from the order or judgment will show what was meant in the extradition warrant by the words "participation in fraud by an agent or trustee":

"I have determined that they should be surrendered  *  *  *  on the ground that they are accused of the following extradition crimes; that is to say, for that the said Benjamin D. Greene and John F. Gaynor: (1) Did, on or about July 1, 1897, within the Eastern Division of the Southern District of Georgia, in the United States of America, participate in fraud then and there committed by Oberlin M. Carter, a disbursing officer, agent, and trustee in the employment of the government of the United States, (a) by entering into a corrupt agreement (conspiracy) with the said Oberlin M. Carter, the said officer and agent of the United States, to defraud the United States in the discharge of the duties of his said office and employment, and for the payment by him, as such disbursing officer and agent of the United States, out of the public moneys of the United States intrusted and to be intrusted to him as such disbursing officer and agent, of fraudulent claims made and to be made against the United States for the benefit of said conspirators, and to be presented to said disbursing officer for his approval and payment; by which corrupt agreement and deceitful device the said officer and agent transferred the exercise of the discretions of his office, and the services of his employment, which he was in duty bound as such officer and agent to render honestly and faithfully to and in favor of the United States, from the United States, his principal and employer, to the said Benjamin D. Greene, John F. Gaynor, and others, so that the said United States, by said corrupt agreement itself, lost what it was entitled to have, the honest and faithful services of its said public officer and agent, to its injury."

It is not usual, nor would it be expedient or practicable, for the warrant of extradition to describe the crime with all the fullness that would be required in an indictment. The words "participation in fraud by an agent or trustee" must be looked at and construed in connection with the proceedings which caused their use. When so considered, it becomes clear that the Canadian Minister of Justice, by the use of the words in the extradition warrant, referred to the charge made by the United States and the acts of the defendants proved in the case and described in the extradition judgment. The extradition warrant, in fact, refers to the judgment by its date, and as the "warrant of Ulric Lafontaine, Esquire, Commissioner under the 'Extradition Act.'" The indictments in question plainly charge the identical corrupt and fraudulent agreement or conspiracy for which the Extradition Commissioner committed the defendants, holding that such acts constituted participation by conspiracy in fraud committed by an agent or trustee. The indictments charge, as do the proceedings in Canada, a corrupt agreement or conspiracy to defraud the United States; that the conspiracy was between the defendants and Oberlin M. Carter, an officer and agent of the United States, and that the purpose was to defraud the United States in the discharge of the duties of his office; that the fraud concerned money intrusted and to be intrusted to Carter as such officer and agent, etc. It is not possible to read the indictments and the proceedings leading up to the extradition and not see that both charge and relate to the same acts and transactions as constituting an offense against the laws of the United

States. It is contended by counsel that the extradition is for participation in fraud by an agent or trustee, and that the first and second indictments are for conspiracy. That is true, but it is not the whole truth. The conspiracy charged in the indictment is a conspiracy with an agent to defraud. The acts of the defendants charged as constituting the participation in fraud in the extradition are the same acts charged as a conspiracy to defraud in the indictments. While the extradition and the indictment must be for the same criminal acts, it does not follow that the crime must have the same name in both countries. The same crime often has different names in different countries. If the act in question is criminal in both countries and is within the terms of the treaty, nothing more is required. In deciding whether the indictment charges the same offense for which the defendants were extradited, the acts of the defendants alleged in the two proceedings must be considered. It is not a question of names. The technical niceties and distinctions recognized sometimes in criminal law as making a fatal variance cannot be applied. Cohn v. Jones (D. C.) 100 Fed. 639; State v. Spiegel, 111 Iowa, 701, 83 N. W. 722; State v. Rowe, 73 N. W. 833, 104 Iowa, 323; In re Cortes (C. C.) 42 Fed. 47. It is held that one extradited by the Mexican government as an accomplice may be, on the same facts, indicted and tried as a principal, the distinction between principals and accessories being abolished by local statutes. In re Rowe, 77 Fed. 161, 23 C. C. A. 103. In Bryant v. United States, 167 U. S. 104, 108, 17 Sup. Ct. 744, 42 L. Ed. 94, a fugitive from justice was charged under the treaty between the United States and Great Britain with the crimes of forgery, larceny, and embezzlement and false entries committed in London. The commissioner held the evidence sufficient to warrant the prisoner's commitment for extradition, and committed him generally on the charges made. The prisoner sought release on the ground that as he could only be tried for the particular offense for which he was surrendered, the demanding government and the commissioner should have elected, and that, if the latter deemed the evidence sufficient to commit upon the one, he should not have been committed upon the other. Responding to the objection, the Supreme Court said:

"So long as the prisoner is tried upon the facts which appeared in evidence before the commissioner, and upon the charges or one of the charges for which he is surrendered, it is immaterial whether the indictment against him shall contain counts for forgery, larceny, or embezzlement. That is a matter of practice with which we have nothing to do."

So the Canadian authorities considered and decided this case. They surrendered the defendants to be tried upon "the facts which appeared in evidence before the commissioner," and it was immaterial what practice or form of indictment was used in the courts of this country so long as the defendants were tried here for the same offense and upon the same facts. The defendants are tried, within the meaning of the treaty, for the same offense when they are tried for the same acts and for the same charge set out in the demand and shown by the evidence presented to the commissioner.

We are of opinion that the record shows that the first and second

indictments charge the defendants with an offense for which they were extradited.

The second question raised by contentions based on these defenses is, are the acts or alleged crimes of the defendants charged by the United States before the Canadian authorities and for which they were extradicted and with which they are charged in the first and second indictments included in the treaty? The fact that the executive department of this Government requested the surrender of the defendants under the treaty on these facts shows that it construed the treaty as embracing the crime shown by the acts charged. The surrender of the defendants by the executive of the Canadian government charged with the duty of deciding the demand shows that that government acquiesced in the construction placed on the treaty by the United States. The defendants applied to the Canadian courts, and they upheld the judgment of extradition. This concurrent action is a construction placed on the treaty by both parties to it. These several acts, executive and judicial, were to the effect that the acts of the defendants charged in the extradition demand and proved by the United States came within the provisions of the treaty as constituting participation by the defendants in the fraud of an agent or trustee. Whether such construction of the treaty and application of the alleged facts to it was correct or erroneous is one of the questions to which much of the argument of counsel in this case has been addressed. The learned trial judge decided the question in the affirmative in an elaborate opinion, citing authorities. (D. C.) 146 Fed. 766. The question that first presents itself is whether or not the courts here should review the decision of the executive and courts of Canada on this question. They having decided that the case comes within the terms of the treaty, it is contended by the learned United States attorney that such decision is final —that the extradition judgment and warrant is conclusive that the crime came within the provisions of the treaty. This contention seems to us to be sustained by reason and authority. The defendants had no right of asylum in Canada. If there had been no treaty between this country and Great Britain, Canada, if it chose to do so, could have surrendered them for trial in this country, and they could not have questioned, on their trial, the legality of their surrender. The effect of the treaty is not to add to any natural right of asylum which they had, for they had none. The treaty only provides that Canada must deliver them up for trial for certain specified acts or crimes. It makes it incumbent on that country by contract to do what it might have done by way of comity if no treaty had existed. Ker v. Illinois, 119 U. S. 436, 442. 7 Sup. Ct. 225, 30 L. Ed. 421. It follows that the defendants cannot base their defense on the alleged illegality of their surrender for trial. The question of whether or not a fugitive shall be surrendered must of necessity be decided by the government to which the application for the fugitive's surrender is made. The courts of the country which makes the demand are not expected to review the decisions of the government and the courts of the country which makes the surrender. It would place the judicial and executive branches of this government in unseemly and useless conflict to have the courts decide that the demand was not authorized by the treaty after the country on which the

demand was made had granted it and the courts of that country had approved it. It seems, therefore, reasonable that the courts here should decline to review and reverse a decision of the Canadian government and courts that the .offense was extraditable. That question should be closed by the decisions of the Canadian authorities and courts. The defendants may demand here that they be tried only for the offense for which they were extradited, but they cannot defend on their trial in this country by the averment that the demand and surrender were not sanctioned by the treaty after the surrender has had the approval of the courts of the country on which the demand was made. The treaty contains but one limitation as to the offense for which the surrendered fugitive may be tried; that is, that he shall not be tried for any crime or offense other than "the offense for which he was surrendered." The courts here are within the terms of the treaty when they limit the trial to the offenses for which the fugitives were surrendered. In Lascelles v. Georgia, 148 U. S. 537, 545, 13 Sup. Ct. 687, 690, 37 L. Ed. 549, the Supreme Court, speaking of international extradition, said that it "depends upon treaty contract or stipulation, which rests upon good faith, and in respect to which the sovereign upon whom the demand is made can exercise discretion, as well as investigate the charge on which the surrender is demanded." It is clear that, when such sovereign's discretion is exercised against the surrender of the fugitive, the courts of this country could not interfere. The same rule should apply when, after investigation, the sovereign exercises discretion in favor of granting the demand, especially when the fugitive appeals to the courts of that sovereign and they hold that the surrender was within the treaty.

The third paragraph of article 2 of the treaty provides that "if any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government in whose jurisdiction the fugitive shall be at the time shall be final." 26 Stat. 1509. Article 2 relates to offenses of a political character, and it is urged that the language quoted is confined to decisions relating to offenses of that character. But it seems to us that this language merely emphasizes by express agreement in reference to the second article of the treaty what must, upon reason and principle, be true as to the whole—that the decision of the authorities of the government in whose jurisdiction the fugitive shall be found is necessarily final. As we have observed, the courts of this country cannot review a decision of foreign authorities against extradition; and when such decision is in favor of the demand of this government, the defendants being deprived of no common-law or statutory right, there is no reason why it should not be conclusive on the courts of this country. The recent case of Johnson v. Browne, decided by the Supreme Court April 8, 1907, 27 Sup. Ct. 539, 205 U. S. 309, 51 L. Ed. 816, contains expressions that sustain our conclusion. Browne was indicted and extradited for a violation of section 5444 of the Revised Statutes, which provides for the punishment of "every officer of the revenue who, by any means whatever, knowingly admits or aids in admitting to entry any goods, wares, or merchandise, upon payment of less than the amount of duty legally due thereon." Browne having been arrested in Canada charged with the violation of that statute, the Canadian commissioner held him and

ordered his extradition, and upon a writ of habeas corpus the Court of King's Bench affirmed the order. When brought to the United States, the authorities here wrongfully imprisoned him for an offense for which he was not extradited. In his effort to be discharged from such imprisonment, the case reached the Supreme Court, and that court held, citing United States v. Rauscher, 119 U. S. 407, 7 Sup. Ct. 234, 30 L. Ed. 425, that Browne, when so extradited, could not be imprisoned upon a former conviction of a crime for which the Canadian authorities had refused to extradite him. In affirming his discharge from such illegal imprisonment, the Supreme Court found it necessary to refer to the crime for which he had been extradited; that is, a violation of section 5444 of the Revised Statutes. The court said:

"It does not appear that any movement has been made or notice given by this government to try the respondent on the indictment for the crime for which he has been extradited. * * * Whether the crime came within the provisions of the treaty was a matter for the decision of the Dominion authorities, and such decision was final by the express terms of the treaty."

The learned counsel for the defendants contend that this is a dictum; that the precise point did not necessarily arise in the case. We are not sure that this is true. The Supreme Court was affirming the discharge of the prisoner from an illegal imprisonment. He had been extradited for admitting or aiding in admitting merchandise to entry in this country for less than the legal duty. Rev. St. § 5444. That offense, by a specific name, is not mentioned in the treaty. The question necessarily occurred to the Supreme Court as to what course the court having jurisdiction should take as to the prisoner in reference to the offense for which he had been extradited. One purpose of the opinion of an appellate court is to advise and instruct the trial court. It is not clear to us that the matter in point was not before the Supreme Court, and that it was not responding to a question in the case when it held that whether the crime came within the provisions of the treaty was a matter for the decision of the Dominion authorities, and that such decision was final. Whether it be a dictum or not, the language is so pertinent and so consonant with reason that we would not feel justified in disregarding it.

But if it were true that the facts disclosed by the demand and surrender—the extradition proceedings—did not show a case within the treaty, it is difficult to see how the defendants could take advantage of it; for, if the parties to the treaty choose to construe it as including a crime not really covered by it, the defendants have no more cause of complaint than they would have if the parties included the crime by a new treaty. They could do this, and the new treaty would be retroactive. 1 Moore on Extradition, § 86. Although there is a treaty which provides for the surrender of fugitives charged with the commission of specified offenses, as to crimes not specified the parties to the treaty stand as if no treaty had been made. In the absence of a treaty, every state can, if it chooses, refuse an asylum to fugitives from justice from other states. There are publicists who hold that there is a positive obligation to deliver up a person accused of the commission of a crime in another country upon demand of its government, while others hold that the obligation is so imperfect as, in the absence

of express contract, to depend entirely upon comity and convenience. The modern view and the one. maintained in this country, is that a state is under no absolute obligation to surrender fugitives accused of crime unless it has contracted to do so. Taylor's International Public Law, § 205. But the existence of a treaty relating only to certain. crimes does not deprive either nation of the right to exercise its own discretion pursuant to its own laws in cases not coming within the terms of the treaty. As to persons charged with crime not coming within the treaty, each government, as an incident to its own sovereignty, may either grant or deny to the fugitive an asylum within its jurisdiction. If the charges in question here were really without the terms. of the treaty, there would have been no absolute obligation on the Canadian government to have granted the demand, and the presumption would be that the surrender had been made as an act of comity, and the defendants could be tried for the offenses for which they were extradited, although they were not within the treaty. Moore on Extradition, §§ 40, 42, 97; Ex parte Foss, 102 Cal. 347, 36 Pac. 669, 25 L. R. A. 593, 41 Am. St. Rep. 182. If they had been kidnapped and brought to this country, that fact, it is held, would not afford them any legal grounds of defense in the courts of this country. Ker v. Illinois, 119 U. S. 436, 7 Sup. Ct. 225, 30 L. Ed. 421. For stronger reasons, we think they could not base their defense upon the fact that the demand was not authorized and the surrender not required by the treaty, but that the Canadian authorities had yielded to the request of the United States upon principles of comity. While that principle is not involved here, it shows the necessity and reason of the rule that the decision of the authorities having jurisdiction of the demand for the fugitive is conclusive.

The demand in this case having been made upon the theory that the case comes within the terms of the treaty, and the Canadian executive and courts having so determined, we hold that such decision was conclusive on the trial court and on this court that the crime for which the defendants were extradited comes within the provisions of the treaty.

The defendants demurred to the first indictment. The District Court overruled the demurrers to the counts numbered 1 to 8, inclusive, and sustained the demurrers to the ninth and tenth counts. The learned judge handed down an opinion as to the sufficiency of the first eight counts of the indictment. 115 Fed. 343. This ruling is assigned as error. But it seems to us unnecessary to examine the question as to the sufficiency of the first indictment. The second indictment, which was found after the demurrers were filed to the first, covers all the charges under section 5440 which are contained in the first indictment, and it was evidently drawn to meet the objections which had been made to that indictment. The verdict of the jury was guilty on all the counts of both the indictments. The sentences imposed are such as could have been imposed for a violation of sections 5438 and 5440 under the second indictment alone. A general judgment upon an indictment containing several counts and a verdict of guilty on each count cannot be reversed if any count is good and is sufficient to support the judgment (Claassen v. United States, 142 U. S. 140, 12 Sup.

Ct. 169, 35 L. Ed. 966; Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830); and the same principle is applicable to consolidated indictments (Porter v. United States, 91 Fed. 494, 33 C. C. A. 652). If there are defects in the first indictment, they are, for all practical purposes, corrected by the second indictment.

Demurrers were also interposed to the second indictment, but a careful examination of it in the light of the briefs and argument sub- mitted discloses, we think, no substantial defect in it. One of the grounds of demurrer was that more than three years had elapsed be- tween the commission of the offense and the return of the indictment. This indictment in every count charged that the defendants were "persons fleeing from justice" for a period which would take the case out of the statute. Rev. St. § 1015. Besides, the defense of the stat- ute of limitations could not be made by demurrer. United States v. Cook, 17 Wall. 168, 21 L. Ed. 538.

The defendants, of course, had the right to avail themselves of the statute of limitations by evidence under the general issue. The learned counsel for the defendants contend that the case should be reversed because of that defense. The first indictment was returned December 8, 1899, within less than three years after the time of the commission of the alleged offenses, and we do not understand that it is claimed that the defense of the statute of limitations is applicable to that indictment. The second indictment was returned February 28, 1902. It charges the conspiracy as of date January 1, 1897, and overt acts pursuant to the conspiracy March 17, 1897, and July 6, 1897. Other counts of this indictment charge the presentation of false accounts to Carter for approval on July 1, 1897. The third indictment was returned No- vember 18, 1905, and it charges the embezzlement as having occurred July 6, 1897. The statute of limitations of three years is applicable to the offenses charged. Rev. St. § 1044. These indictments charge in each count that the defendants were "persons fleeing from justice." Rev. St. § 1015, provides that the limitation of three years shall not "extend to any person fleeing from justice." If it were proved that the crimes were committed at the times alleged, regardless of the ques- tion of flight from justice, the statute of limitations of three years would not have barred the prosecutions before July, 1900. The three years would not have expired from the alleged dates of the crimes be- fore that time. A controlling question of fact as to the second and third indictments, therefore, was whether or not the defendants be- came fugitives from justice—"persons fleeing from justice"—before July, 1900. If they were before that time persons fleeing from jus- tice, the statute of limitations of three years did not extend to them. The defendants did not have to leave the United States to become per- sons fleeing from justice within the meaning of the statute. If they committed a crime in the Southern District of Georgia, and, when sought to be tried by the court having jurisdiction, they had left the district and are found in another state and district, and not in the district of their homes, under circumstances indicating a purpose to evade the authority and jurisdiction of the local courts, they might be justly considered fugitives from justice. Streep v. United States, 160 U. S. 128, 16 Sup. Ct. 244, 40 L. Ed. 365. Evidence was pre-

sented tending to prove the crimes charged in the second indictment, including the overt acts, and evidence was also presented tending to prove the embezzlement charged in the third indictment. On the issue as to whether or not the defendants were persons fleeing from justice so that the statute of limitations would not extend to them, the government offered evidence making that a proper question to be submitted to the jury. This evidence, in part, was to the effect that the defendants were in the Southern District of Georgia in 1897 and 1898; that in 1898 Capt. Carter was tried and convicted by court-martial; that in October, 1899, the United States attorney for that district was charged with the investigation of the matters developed in the trial of Carter; that the United States attorney, in November, 1899, issued instructions to the deputy·marshals of the district to search for the defendants in that district; that they made such search, and that the defendants were not found in the district; that when arrested they were in the Southern District of New York, but that none of the defendants lived in that district; that the defendants resisted proceedings to remove them from the Southern District of New York to Georgia for trial; and that, later, they fled to Canada. There was also evidence tending to show that the defendants were not fleeing from justice till they fled to Canada. But it is sufficient for the purposes of our decision to show that there was evidence proper to be submitted to the jury and sufficient to sustain a verdict that the defendants became fugitives from justice, or "persons fleeing from justice," prior to July, 1900. This court, in the exercise of its appellate jurisdiction, cannot review and reverse the verdict of a jury upon the facts of the case.

The bill of exceptions shows that, after the case was argued to the court and jury, the court, on the motion of the defendants' attorneys and against the objection of the United States attorney, made the following order:

"As to the exceptions to the charge of the court, or to the refusal by the court to charge, it is ordered that the defendants shall have the right, within two days after date of the delivery of the charge to the jury in said cases, to present to the court whatever exceptions they deem necessary or proper to the charge as given, or to the refusal by the court to charge as requested by the defendants, the said exceptions to be noted by the court and filed as of the date of the delivery of the charge, and as if said exceptions were taken before the jury retired.

"In open court, April 10, 1906."

After making this order the court charged the jury, and the verdict was returned and the jury discharged on April 12, 1906. Two days later, the defendants presented many exceptions to the charge of the court, and their exceptions to the failure of the court to give many charges which the court had been duly requested to give. It therefore affirmatively appears by the record that the exceptions to the charge of the court and the refusal of the court to give requested charges were taken after the jury had returned the verdict and had been discharged. The rule established by many decisions of the Supreme Court is that no instruction to the jury given or refused by the court below can be brought to that court for revision by writ of error unless the record shows that the exception to it was taken or reserved while the jury were at the bar. Barton v. Forsyth, 20 How. 532,

15 L. Ed. 1012; Pacific Express Co. v. Malin, 132 U. S. 531, 10 Sup. Ct. 166, 33 L. Ed. 450; St. Clair v. United States, 154 U. S. 134, 14 Sup. Ct. 1002, 38 L. Ed. 936; Lewis v. United States, 146 U. S. 370, 13 Sup. Ct. 136, 36 L. Ed. 1011. There would be no controversy here about the application of this rule except for the order we have quoted. It should be kept in view that the order was made on the motion of the defendants' counsel and against the objection of the government. It is argued here by the learned counsel for the defendants that the effect of the order was to make a rule of court for this case. If the court could make such a rule for this case, it could be made for all cases, and such a practice, it has been held, would be improper and "beyond the power of the court to adopt." Johnson v. Garber, 73 Fed. 523, 527, 19 C. C. A. 556. In reference to the general rule requiring exceptions to a charge to be taken before the jury leave the bar, it is said that "the rule is mandatory. Its enforcement does not rest in the discretion of the lower court." St. Louis, etc., Ry. Co. v. Spencer, 71 Fed. 93, 95, 18 C. C. A. 114; Price v. Pankhurst, 53 Fed. 312, 313, 3 C. C. A. 551. See, also, MacDonald v. United States, 63 Fed. 426, 429, 12 C. C. A. 339. In Phelps v. Mayer, 15 How. 160, 14 L. Ed. 643, it was said:

"It has been repeatedly decided by this court that it must appear by the transcript, not only that the instructions were given or refused at the trial, but also that the party who complains of them excepted to them while the jury were at the bar. The statute of Westminster II, which provides for the proceeding by exception, requires, in explicit terms, that this should be done; and, if it is not done, the charge of the court, or its refusal to charge as requested, forms no part of the record, and cannot be carried before the appellate court by writ of error. It need not be drawn out in form and signed before the jury retire; but it must be taken in open court, and must appear, by the certificate of the judge who authenticates it, to have been so taken."

In Barton v. Forsyth, 20 How. 532, 15 L. Ed. 1012, referring to the rule, it is said:

"This is required by the statute which authorized the exception, and cannot be dispensed with."

It is also urged that the effect of the order was that the court regarded every portion of its charge as excepted to, and made the order to denote such exception. The order was made before the charge was delivered, so it would be difficult to place that construction on the order; but an exception to an entire charge would not raise any question for review. Holder v. United States, 150 U. S. 91, 14 Sup. Ct. 10, 37 L. Ed. 1010; Bogk v. Gassert, 149 U. S. 17, 13 Sup. Ct. 738, 37 L. Ed. 631.

The attorneys for the United States had the right to ask that the usual rule be followed. There could be no sound reason, not even one of convenience, for granting the defendants' motion that the requested charges should not be presented in open court before the jury retired, and the exceptions then and there reserved to the refusal of the court to give them. The bill of exceptions does show the charges to have been duly presented, but the exceptions to the refusal to give them were not made until two days after the trial was ended. But little time would have been required to announce exceptions to such refusal. The ex-

ceptions being made in open court, the United States attorney would have been within his line of duty, if he thought any one of the charges proper to have been given, to have said so, and to have asked, if he chose, explanatory instructions. As to the exceptions to the charge of the court, it would have consumed some time to have noted them; but we cannot believe that the argument that it would be more convenient to the parties or their attorneys is sufficient reason for departing from the well-settled rule requiring the exceptions to be taken before the jury retire from the bar. The court may be willing to subject its charge to a two days' examination for the purpose of exceptions, but the parties litigant have the right to require the regular practice. If an exception is made to a part of the charge at the bar, the court might discover an inaccuracy or error and correct it at once. The United States attorney, being present when the exceptions were made, would be at liberty, if he deemed it proper and necessary to protect the interest of the government, to respectfully suggest to the court modifications or corrections in the parts of the charge to which exceptions were taken. A departure from the regular course was not justified by anything that appears in the record.

It is true, as argued by counsel, that an appellate court has the power to correct plain errors, even when exceptions are not duly or well taken, and that to prevent injustice it will sometimes do so. Our examination of the case has extended to all points presented in briefs and argument, without regard to the time when the exceptions were taken, with the view of seeing that no injustice was done the defendants. We find nothing in the record to show that the result of the trial in the court below led to an unjust verdict or judgment, or that an error was committed that would make it our duty to reverse the judgment.

The judgment of the District Court is affirmed.

PARDEE, Circuit Judge (dissenting). "It is better that a prisoner should escape altogether than that a judgment of conviction of an infamous crime should be sustained where the record does not clearly show that there was a valid trial." Crain v. United States, 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097.

I do not agree with my brethren in their disposition of this case. Upon the trial before the jury, the court permitted the government, over the objection of the defendants, to introduce in evidence the books of the American Exchange National Bank of New York, consisting of ledgers and journals. These books purported to contain accounts of B. D. Greene, John F. Gaynor, and William T. Gaynor with the bank. The court also permitted the government, over the objection of the defendants, to introduce certain compilations of the accounts and statements contained in these books. The only evidence introduced by the government in support of the books is that of Alfonso De Guiscard, who testified that he was supervising bookkeeper of the bank over 13 bookkeepers immediately under him; that these bookkeepers made entries in the ledgers, copying from journals in which the original entries were made by still other clerks, that the bank kept correct books; that he had no personal knowledge of any of the transactions set out in the books; that he had made none of the entries himself. The

clerks who made the original entries were not produced, nor was it shown that they were dead or inaccessible. The defendants objected to the introduction of this evidence upon the ground that the books were not proven to be books of original entry; that the entries therein were not proven by the persons who made the entries, nor their unavailability accounted for; that none of the facts came within the personal knowledge of the witness De Guiscard. The court overruled these objections, and the defendants excepted. Under similar evidence, over the objections of defendants, the court permitted the books of corporations and partnerships in the city of New York and elsewhere to be admitted in evidence showing sales of bonds, deposits of money by a third person, stock transfers, disbursements of money, and the visits to safety-deposit vaults as entered by gatekeepers. Against these rulings counsel in vain invoked the common law, the decisions of the Supreme Court, the decisions of state Supreme Courts, text-books on evidence, and statutes of the state of Georgia.

To support the rulings in question the government relies upon the necessities of the case, supported by the dictum and argument of 2 Wigmore, § 1530, p. 1895 et seq. Many of the cases cited by Wigmore to support his views are irrelevant here, and those relevant are civil cases, and in most of them the books involved were the books and records of one or the other parties to the suit. No criminal case ruled by any high court supporting the ruling of the court below has been cited; but against such ruling see Kirby v. United States, 174 U. S. 47, 19 Sup. Ct. 574, 43 L. Ed. 890; State v. Thomas, 64 N. C. 74; Lang v. State, 97 Ala. 41, 12 South. 183; Commonwealth v. Clark, 145 Mass. 251, 13 N. E. 888; Shinn v. Commonwealth, 32 Grat. (Va.) 899; Davis v. State, 91 Ga. 167, 17 S. E. 292; People v. Quinn, 18 Cal. 122; People v. Mitchell, 94 Cal. 550, 29 Pac. 1106; Howard v. State, 35 Tex. Cr. R. 136, 32 S. W. 544; Wade v. State, 37 Tex. Cr. R. 401, 35 S. W. 663. Cases on this line can be multiplied indefinitely. According to a time-honored maxim, necessity is not a safe guide in a court of law. The record shows that, after the close of the evidence and after the argument of counsel, the court passed the following order:

"As to the exceptions to the charge of the court, or to the refusal by the court to charge, it is ordered that the defendants shall have the right, within two days after date of the delivery of the charge to the jury in said cases, to present to the court whatever exceptions they deem necessary or proper to the charge as given, or to the refusal by the court to charge as requested by the defendants, the said exceptions to be noted by the court and filed as of the date of the delivery of the charge, and as if said exceptions were taken before the jury retired."

"In open court, April 10, 1906.          Emory Speer, Judge."

Thereafter, the trial judge delivered a charge to the jury which takes up 127 pages of the printed record and took the better part of two days to deliver. The charge is a literary and oratorical masterpiece, dealing with all aspects of the case, issues, evidence, inferences, presumptions of law and fact, character of witnesses, etc., and at the same time it was a persuasive, argumentative charge, mainly if not wholly on the side of the prosecution. I give a quotation from the charge:

"And the jury will inquire if there is evidence to justify the unsparing assault upon the character and conduct of Major Cassius E. Gillette. If Gillette discovered when he succeeded Carter that the circumstances surrounding these important government contracts, the vast sums expended in their execution, and the condition of the office of which he was now to become responsible, not only was it his duty to report it at once for investigation, but if, with the knowledge of the facts he had suppressed them and gone forward with the work without notifying his superior officers, he himself would have become responsible and would have been himself liable had they been subsequently discovered. Was an investigation demanded? The head and front of his offending was that he caused an investigation to be made. If it be true, as stated by Rees, that Gillette felt himself responsible officially, personally, and socially for the truth of the charges which were presently investigated by the court of inquiry, was it unnatural that he should fight for his own character and for his status in the army? It being obligatory upon him to make the charges, was it not then obligatory upon him to repeal unjustifiable assaults made upon him? Aside from the question of guilt or innocence of the prisoners on trial, was an investigation needed? To hold otherwise is to condemn the court of inquiry, the court-martial, the District Court of the United States for the Southern District of New York, the Circuit Court of the United States where Judge Lacombe presided, three grand juries of the Southern District of Georgia, the Supreme Court of the United States, all the Canadian courts as in successive applications their action was sought, and the Great Privy Council of England, a body of advisers for the Sovereign holding office for life, whose judicial functions are performed by the Chief Justice and the four law Lords of Appeals of Great Britain. None of these tribunals pronounced these defendants guilty, but the action of all is corroborative of the fact that an investigation here was essential, and to bring this about in discharge of his duty was what Gillette did.

"It was declared by the prisoners' counsel in the presence of the jury that Savannah had ostracised Gillette. I recall no testimony of that fact, except perhaps an indignant expression by Gillette himself. Ostracised! The word has no place in the vocabulary of American jurisprudence. It is derived from the Green word 'ostrakon,' a shell, and, when the fickle populace of Athens desired to get rid even of their bravest and best, they voted with the ostrakon, and expelled him from the borders of the City of the Violet Crown. It is related of Aristides, that great Athenian statesman and one of the noble generals who fought against the countless hordes of the Persians,

"Where the mountains look on Marathon,
And Marathon looks on the sea,"

that a jealous rival was attempting to procure his banishment by ostracism. A rustic citizen happened to be near Aristides himself in the public assembly which was about to decree his banishment, and turning to him, without knowing who he was, asked him how to write the name Aristides upon the shell with which he was going to vote. 'Has Aristides injured thee?' inquired the great Athenian. 'No,' answered the voter, 'but I am tired of hearing him called "Aristides the Just." ' And Aristides was ostracised. But on fuller knowledge of his character his fellow citizens reversed the decree of banishment. * * * But while our government is strong, it is not strong in an oppressive sense. Our people enjoy the largest share of liberty, consistent with safety, of any other known to man. It is the embodiment of justice and humanity to those who are accused of crime. They are informed of the nature of the accusation against them; they are given a speedy and impartial trial, by an impartial jury, in the district wherein the crime is committed; they are given compulsory process to obtain the presence and testimony of their witnesses, and, if unable to pay the expense of securing their attendance, the government will pay it for them. They are given the privilege of counsel; they cannot be deprived of life, liberty, or property without due process of law; and due process of law comprehends in cases like this not only a rigid compliance with all of those rights which are secured by the Constitution, but the right, in case error is committed in a court of original trial, to appeal to courts whose jurisdiction is appellate and corrective, and in cases of peculiar

importance to that tribunal, the Supreme Court of the United States, which concentrates in its jurisdiction the loftiest juridical power of any court on earth.

"The prisoner is at no disadvantage. He may challenge the array of the grand jury. While the government has three peremptory challenges, he is accorded ten; while he has appeal, the government has none. The verdict of a jury against the government in criminal cases is final; the verdict of a jury against the accused may be readily set aside if it is contrary to law or evidence, or if in the conduct of the trial reversible error has been committed by the court."

Ab uno disce omnes.

The plaintiffs in error insist with great force that many of the rules of law therein stated are incorrectly given. In Starr v. United States, 153 U. S. 624–5, 14 Sup. Ct. 919, 923, 38 L. Ed. 841, Chief Justice Fuller, for the unanimous court, said:

"It is true that in the federal courts the rule that obtains is similar to that in the English courts, and the presiding judge may, if in his discretion he think proper, sum up the facts to the jury: and if no rule of law is incorrectly stated, and the matters of fact are ultimately submitted to the determination of the jury, it has been held that an expression of opinion upon the fact is not reviewable on error. Rucker v. Wheeler, 127 U. S. 85, 93, 8 Sup. Ct. 1142, 32 L. Ed. 102; Lovejoy v. United States, 128 U. S. 171, 173, 9 Sup. Ct. 57, 32 L. Ed. 389. But he should take care to separate the law from the facts, and to leave the latter in unequivocal terms to the judgment of the jury as their true and peculiar province. McLanahan v. Universal Insurance Co., 1 Pet. 170, 182, 7 L. Ed. 98. As the jurors are the triers of facts, expressions of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments. They should be made distinctly to understand that the instruction is not given as to a point of law by which they are to be governed, but as a mere opinion as to the facts, to which they should give no more weight than it was entitled to. Tracy v. Swartwout, 10 Pet. 80, 96, 9 L. Ed. 354; Games v. Stiles, 14 Pet. 322, 10 L. Ed. 476. The same rule prevails in the courts of many of the states, and in the charge in Commonwealth v. Selfridge, referred to by the court below, these views were expressed upon the subject: 'As to the evidence, I have no intention to guide or interfere with its just and natural operation upon your minds. I hold it the privilege of the jury to ascertain the facts, and that of the court to declare the law, to be distinct and independent. Should I interfere, with my opinion, with the testimony in order to influence your minds to incline either way, I should certainly step out of the province of the judge into that of an advocate. All that I can see necessary and proper for me to do in this part of the cause is to call your attention to the points or facts on which the cause may turn, state the prominent testimony in the case which may tend to establish or disprove these points, give you some rules by which you are to weigh the testimony if a contrariety should have occurred, and leave you to form a decision according to your best judgment, without giving you to understand, if it can be avoided, what my own opinion of the subject is. Where the inquiry is merely into matters of fact, or where the facts and law can be clearly discriminated, I should always wish the jury to leave the stand without being able to ascertain what the opinion of the court as to those facts may be, that their minds may be left entirely unprejudiced to weigh the testimony and settle the merits of the case.' So the Supreme Court of Pennsylvania says: 'When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided. The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him; deductions and theories not warranted by the

evidence should be studiously avoided. They can hardly fail to mislead the jury and work injustice.' Burke v. Maxwell, 81 Pa. 139, 153. See, also, 2 Thompson on Trials, 2293, 2294, and cases cited.

"It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling. Hicks v. United States, 150 U. S. 442, 452, 14 Sup. Ct. 144, 37 L. Ed. 1137."

And again, in Allison v. United States, 160 U. S. 217, 16 Sup. Ct. 252, 258, 40 L. Ed. 395:

"Where the charge of the trial judge takes the form of animated argument, the liability is great that the propositions of law may become interrupted by digression, and so intermingled with inferences springing from forensic ardor that the jury are left without proper instructions, their appropriate province of dealing with the facts invaded, and errors intervene which the pursuit of a different course would have avoided."

The charge of the trial judge, measured by these decisions of the Supreme Court, is clearly erroneous, and in any ordinary case would warrant, if not absolutely require, a reversal.

In this court it was urged by the government that the order of the court, giving two days within which exceptions could be prepared to the very lengthy charge was erroneous, if not illegal, and that because the exceptions to the objectionable portions of the judge's charge were not taken before the jury retired they cannot be considered. A majority of the court in this case seem to adopt this view, and in that way deprive the plaintiffs in error of all rights to insist upon the objections to the judge's charge, which in this court they claim actually took the determination of the facts from the jury and coerced the verdict. The objection seems to be in the nature of a confession and avoidance. Whether or not counsel for plaintiffs in error originally suggested the order of the court referred to, it seems to me that in all fairness and justice their clients ought to have the benefit of the order. The trial judge had in due season received the formal requests of the plaintiffs in error as to specific charges, and in fact five days before had received and passed upon motions to direct a verdict upon assigned grounds outlining the points of law relied on, and was thus fully advised of the lines of defense, and he had carefully considered and prepared his elaborate charge covering every point in the case, and was willing that the plaintiffs in error should have an opportunity to examine and object to any part of it, and for that purpose delay was absolutely necessary. The only good excuse for the ruling that exceptions to the judge's charge should be taken before the jury retires is that the judge should in due season have his attention called to the matters in question, and have full opportunity to correct, amplify, and explain. Where he does not desire such opportunity and expressly waives the same, the reason for the ruling fails. But even if the order was improvident and void, the better way for the court on review, always seeking to find if the convicted have had a valid trial, to treat the matter, is that adopted by the Supreme Court of the United States in Burton v. United States, 196 U. S. 305, 306, 25 Sup. Ct. 243, 49 L. Ed. 482, where a conviction was reversed on an exception not taken until after the jury had retired.

See, also, Wiborg v. United States, 163 U. S. 652, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; Clyatt v. United States, 197 U. S. 221, 25 Sup. Ct. 429, 49 L. Ed. 726.

After the close of the evidence the plaintiffs in error by their counsel moved to direct a verdict on each of the counts in indictment 476, assigning several reasons why they were entitled to such instruction, but principally "because the evidence shows that this court has no jurisdiction of the offense therein alleged, that the money therein described was received by these defendants in New York City, and that the courts of the United States for the Southern District of New York, and not this court, has jurisdiction of the alleged offense." The undisputed evidence with regard to the embezzlement alleged in indictment 476 is that Carter left Savannah June 30, 1897, for Washington, carrying with him one blank check taken from his disbursing checkbook and another unsigned check filled out except as to date. Carter did not at that time have information as to amount due for work done on the Savannah harbor; this information was wired to him by his clerk, Sterly. The appropriation of 1896 was not available until July 1, 1897, and Carter had to make requisition for the funds before they could be or were placed to his credit. Upon the order of the Secretary of War the funds were placed to his credit on July 3d in the subtreasury of New York. Thereupon the checks in question for the money alleged to have been embezzled were issued and delivered to John F. Gaynor in the Southern District of New York. E. H. Gaynor, treasurer of the Atlantic Contracting Company, signed receipts for the money on the claims. When Carter returned to Savannah he directed Sterly to enter note of the two disbursing checks on the claims alleged to have been paid. It appears that the checks delivered by Carter to John F. Gaynor in New York were indorsed as follows: "Atlantic Contracting Co., John F. Gaynor, President"; next, "For Deposit B. D. Greene"; next, "Knickerbocker Trust Co."; next, "Manhattan Co." On these indorsements the checks were paid by the subtreasury in New York. At this time both of the defendants, Greene and Gaynor, and Carter were in the Southern District of New York, and the checks were there deposited to and collected for account of B. D. Greene. Greene and Gaynor remained in New York from the last of June until after Carter's bookkeeping was done in Savannah. It is difficult to see how Carter or the plaintiffs in error could have embezzled the money in question until after it was placed to Carter's credit in the city of New York, or how embezzlement except by intent could have been committed in the Southern District of Georgia. The government contends that the offense was begun by the presentation of the claims in the Southern District of Georgia, followed by the issuance and delivery of the checks of Carter in New York, and was completed in the Southern District of Georgia by Carter in there causing an entry of the payment of these checks to be placed on the claims. What was done in the Southern District of Georgia after the offense was completed in New York is immaterial, and it also seems to me that Carter's intention, formed in the Southern District, to go to New York and there embezzle the funds he was going to draw from the treasury, is also immaterial on the question of jurisdiction. The case

of Burton v. United States, 196 U. S. 283, 25 Sup. Ct. 243, 49 L. Ed. 482, is directly in point. Burton was charged with receiving money for practicing before the Post-Office Department while a United States Senator. The indictment charged that Burton received the money at St. Louis, Mo., through a check there drawn on and paid by a St. Louis bank, and the indictment was found and prosecuted to conviction in the Eastern District of Missouri. The case showed that Burton had arranged in St. Louis to render the services, had there received $500 for his services in that behalf theretofore rendered; that after he was in Washington his employers mailed a check at St. Louis on a St. Louis bank to Burton at Washington. That he received the check in Washington, deposited it with Riggs' Bank in that city, which placed the amount to his credit and thereafter collected the same from the bank on which it was drawn in St. Louis. The court held that the payment of the check to defendant in this manner was a payment at Washington, and if any crime was committed it was not at St. Louis, and reversed the case; and the court further held that it was not a case of the commencement of a crime in one district and its completion in another, so that the court in either district would have jurisdiction. If we follow the case of Burton, it would seem to be clear that the embezzlement in the instant case was committed in the Southern District of New York, and not in the Southern District of Georgia.

All the foregoing questions seem to me to have been wrongly ruled in the court below, and that the rulings therein constituted such prejudicial error as to entitle the plaintiffs in error to a new trial. As on a new trial the errors in question might be avoided, perhaps with the same result, I might have limited myself under the glamor, not to say clamor, attending this case, to a formal dissent. But there is matter plain on the record duly saved in the court below and duly assigned here which, in my judgment, entitles the plaintiffs in error to a reversal on such grounds as would practically put an end to the prosecution, and therefore I feel bound to further outline my reasons for dissenting.

The matter is this: The plaintiffs in error were tried upon three indictments: No. 322, found December 8, 1899; No. 371, found February 28, 1902; and No. 476, found November 18, 1905.

Indictment No. 322 is insufficient in form and substance. In United States v. Greene (D. C.) 100 Fed. 941 et seq., Judge Browne very clearly shows how and why the first eight counts are defective. In United States v. Greene (D. C.) 115 Fed. 343, Judge Speer shows clearly how and why the two remaining counts were held bad, so that the plaintiffs in error were not tried upon them. But it is not necessary to discuss this indictment further than to say that if it can be held good in law it is in all its intents and purposes an indictment for conspiracy under section 5440, Rev. St. U. S., an offense for which the plaintiffs in error could not be and were not extradited. That under section 5440 the offense does not consist of the conspiracy and the overt acts charged, but of the conspiracy alone, is explicitly held in United States v. Britton, 108 U. S. 204, 2 Sup. Ct. 531, 27 L. Ed. 698. See, also, Pettibone v. United States, 148 U. S. 202, 13 Sup. Ct. 542, 37 L. Ed. 419. In United States v. Hirsch, 100 U. S. 33, 25 L.

Ed. 539, it was held that under section 5440 the offense charged was so distinctively conspiracy alone that the three years applied, although the overt acts charged were of themselves crimes against the revenue to which longer limitations applied; and in Berkowitz v. United States, 93 Fed. 452, 35 C. C. A. 379, the Circuit Court of Appeals for the Third Circuit held that a person tried and convicted of conspiracy under section 5440 might under other sections of the Revised Statutes of the United States afterwards be indicted, tried, and convicted of the overt acts charged in the conspiracy indictment. That conspiracy is not an extraditable offense under our treaties with Great Britain, see Johnson v. Browne, recently decided by the Supreme Court, 27 Sup. Ct. 539, 205 U. S. 309, 51 L. Ed. 816. A cursory reading of the extradition warrant in this case, or of the proceedings in the Canadian and English courts found in the record, shows clearly that Greene and Gaynor were not extradited to be tried for conspiracy.

Indictment No. 371 was found over four years and eight months, and indictment No. 476 more than eight years and four months, after July 7, 1897, the date of the last offenses therein charged. It is undisputed that the limitation of three years given by section 1044, Rev. St., bars these indictments, unless within the three years following the commission of the offenses the plaintiffs in error fled from justice within the intent and meaning of section 1045, Rev. St.

The case shows the following state of facts as to the residence and conduct of Greene and Gaynor before and after the matters charged in the indictments, and I understood that there is no dispute as to the same: Greene lived in Washington and Gaynor lived in Fayetteville, N. Y. They contracted for and did work in Georgia, South Carolina, and Virginia. While Washington and Fayetteville were their legal residences, their principal place of residence was in the city of New York. They went back and forth to Georgia and other places as business interests required. This continued until July 7, 1897, the date of the last overt act charged in the indictment. During the time mentioned they entered into and executed many contracts with the government; they signed many bonds, proposals for contracts, guaranties of proposals for other contracts, all of which were approved by government officials at Washington. In each instance they named their place of residence. In 1887 Gaynor signed a contract and a proposal stating his residence to be in the state of New York. During the period of time in question the government and the business world generally were well aware of the residence and habitations of the defendants. In 1892 the Atlantic Contracting Company was incorporated in West Virginia by Greene and Gaynor and others, and its principal place of business was declared in the charter to be in New York City. Gaynor was the president of the company, and in all the contracts entered into with the United States the residence of the corporation was stated to be New York; its address was given as New York City, state of New York. On September 5, 1896, Greene and Gaynor signed a guaranty of proposal for a dredge contract for the Savannah Dredging Company, and therein Gaynor gave his residence as Fayetteville, N. Y., and Greene his as Stamford, Conn. On October 8, 1896, Gaynor, as president, signed the contracts for the harbor improvements in Savannah and

Cumberland Sound, the execution of which forms the basis of the indictments in this case. In those contracts it was stated that the Atlantic Contracting Company was of New York City, New York state. Copies of the above contracts were in triplicate, and the government had copies filed in Washington. During the time mentioned Greene signed proposals and guaranties of proposals for contracts with the government, triplicates of all of which were filed in Washington. In all of these he gave his residence as Washington first, and later New York, and later still Stamford, Conn. His actual residence was at the Manhattan Hotel, New York City, where he belonged to the principal clubs and was well known, and he had a farm at Stamford, Conn., where he claimed his legal residence. Gaynor actually resided at the Hoffman House, New York City; he was widely known in the city and over the state of New York, being a member of the Democratic state central committee. From the signing of the contracts for the Atlantic Contracting Company in 1896 to July 7, 1897, both Greene and Gaynor resided in the North as theretofore, going south to Georgia and elsewhere as their business required. In July, 1897, Greene and Gaynor were working on the contracts entered into in 1896. Will and Ed. Gaynor were the superintendents, and looked after the actual construction of the work. In July, 1897, Capt. Carter was transferred from Savannah to London, and left Savannah to enter upon his duties at London. Major Gillette succeeded him as engineer in charge. In August, 1897, Greene went to Savannah to see Major Gillette, and then he returned to New York. In the fall of the same year Greene again went to Savannah to appear before the board of inquiry appointed to examine into charges against Capt. Carter. In the spring of 1898 both Greene and Gaynor went to Savannah to testify before the Carter court-martial, and thereafter they returned to New York. From July, 1897, to January 8, 1899, Greene spent part of his time at his farm in Connecticut, but the greater portion of his time in New York City, where he had permanent rooms at the Manhattan Hotel; and Gaynor spent part of his time at Fayetteville, New York, but the greater part of his time was spent in New York City, where he had permanent rooms at the Hoffman House.

The first indictment No. 322 was returned December 8, 1899; upon this indictment a bench warrant was issued to the marshal of the Southern District of Georgia, on which he made a return of not found. On the 13th of December, 1899, the assistant district attorney for the Southern District of New York, having in possession a certified copy of indictment No. 322 and bench warrants from the Southern District of Georgia against Greene and Gaynor, filed an affidavit before the United States commissioner for the Southern District of New York to procure the arrest of the indicted parties and their removal to the Southern District of Georgia. Immediately after the defendants had notice of this action, and on December 14, 1899, Greene and Gaynor went before the commissioner and surrendered themselves, demanded a hearing, and, pending the same, were arrested and bailed. On the hearing before the commissioner the defendants attacked the validity and sufficiency of the indictment No. 322, pointing out their objections to the same. On hearing, the commissioner ordered the commitment

of defendants for trial. On this finding of the commissioner the district attorney applied to Judge Brown, of the Southern District of New York, for a removal order, and on April 4, 1900, an adverse opinion was filed refusing the application, on the ground that the evidence adduced, which was merely a certified copy of indictment No. 322, was insufficient. In his opinion (D. C.) 100 Fed. 941, Judge Brown held, on the plea that the indictment was bad on its face, that the first eight counts of the same were bad. On June 26, 1900, Judge Brown referred the matter back to the commissioner for further testimony, and in the order of reference directed the hearing to be commenced on July 6, 1900, and ordered Greene and Gaynor to attend at the time and place, and on that day and from day to day thereafter they attended and submitted themselves to the orders of the court. On July 7, 1900, the three years of limitation prescribed by section 1044, Rev. St., were fully accomplished, for the offenses charged in indictments Nos. 371 and 476 were committed, if at all, on or before July 7, 1897. After further evidence was taken by the commission, and on May 29, 1901, Judge Brown ordered Greene and Gaynor to be removed to the Southern District of Georgia for trial, and to give bail for their appearance. Thereupon, in the Circuit Court of the United States in New York, Greene and Gaynor sued out a writ of habeas corpus on various grounds, which writ was denied, and an appeal was thereupon taken to the United States Supreme Court, where the order denying the application for the writ was affirmed on January 6, 1902. After the decision of the Supreme Court Greene and Gaynor proceeded to Georgia and there reported to the District Court for the Southern District for trial. They filed a demurrer to indictment 322, which was sustained as to two counts, overruled as to eight, and thereupon the case was continued until March 10th. On February 28th indictment No. 371 was returned, and thereon Greene and Gaynor were ordered to appear and plead on March 6th. All this time they had been on bail, but on March 7th they failed to appear, and their bail was forfeited. It seems they had fled to Canada, from which after much trouble and litigation, in September 1905, they were extradited and returned to the United States for trial for "(1) participation in fraud by an agent and trustee, (2) participation in embezzlement, and (3) receiving money and property, knowing the same to have been fraudulently obtained."

Under the above state of facts, it clearly appears that prior to July 7, 1900, the statutory time for the bar to attach, there was no actual flight on the part of Greene and Gaynor from justice or from anything else. They did not leave the country for any purpose, nor abscond nor hide from, or even evade, arrest; on the contrary, as soon as proceedings for their removal were instituted in New York, where it was well known they practically resided, they voluntarily surrendered themselves to the custody of the law. It follows, then, they are entitled to the benefit of the statute, unless (1) the exemption from further prosecution or amnesty once acquired may be forfeited and lost by subsequent flight from justice, or (2) the failure to stay and remain the full three years in the Southern District was a flight from

justice, or (3) the surrender in New York, accompanied with a demand for a hearing, resulting in delay, was a flight from justice.

1. That an exemption once acquired under section 1044 may be forfeited by subsequent conduct is not supported either by the statute, reason, or authority.

2. The failure to constantly remain in the Southern District after their contract with the government was ended, instead of going about their business and staying at their homes and usual well-known resorts, cannot be treated as a flight from justice without trenching on unreason to the verge of absurdity.

3. There remains, then, the question of dilatory proceedings, and this the government relies upon. The flight from justice claimed by the government seems to be a sort of constructive flight, based upon the proceedings in the courts of the United States of the Southern District of New York, which are charged to have been dilatory and from which the jury might infer an intention to evade the jurisdiction of the District Court in the Southern District of Georgia; and that such dilatory proceedings with such intention would be equivalent to a flight from justice within the intent and meaning of section 1045; and we find that on this line, over the objections of the accused, the trial judge charged the jury:

"It would be abhorrent to all principles of justice that these defendants, for instance, could, through the adoption of dilatory proceedings in the courts of the United States, so that the statutes of limitation could run in their favor, and then for some technical defect have the court rule on demurrer, as it did in this case, that two of the counts of the old indictment were bad, and then to hold that the government could not supply those counts or obtain additional indictments which the dilatory tactics adopted may render appropriate."

And the court refused to give, among other requested charges, the following:

"The courts of the United States are always open to a person who desires to defend his rights as to matters of which said courts have jurisdiction, and a person does not become a person fleeing from justice by reason of his having availed himself of the rights and remedies given to him by the Constitution of the United States and the statutes enacted thereunder."

It is now hornbook law that statutes of limitation are to be liberally construed in favor of accused persons. Wharton, Cr. Pl. & Pr. art. 316 (8th Ed.); and to the same purport see Leffingwell v. Warren, 67 U. S. 606, 17 L. Ed. 261. On the other hand, exceptions or provisos are to be established within the words as well as in the reason thereof. United States v. Dickson, 15 Pet. 165, 10 L. Ed. 689. An unlawful intent cannot be inferred from lawful acts; it must be proved. The only dilatory proceedings that can be charged against Greene and Gaynor prior to the statutory bar are the surrender to the law and the demand for a hearing. Government counsel argues that the surrender was concerted and formed a sort of conspiracy—I suppose a conspiracy to do a lawful act in a lawful manner and for a lawful purpose. They had a lawful right to demand a hearing. Why did the hearing called for by them result in any material delay? The answer is plain: Because the government asked for the removal, and after full notice insisted upon it on insufficient evidence, to wit, solely

a certified copy of the indictment which was then and since held to be insufficient evidence to warrant a removal under section 1014, Rev. St. See Tinsley v. Treat (recently decided by the Supreme Court) 27 Sup. Ct. 430, 205 U. S. 20, 51 L. Ed. 689.

That Greene and Gaynor in demanding a hearing were exercising a legal right which, as they were then in custody, ought not or could not prejudice them, seems too plain for argument, but it is pertinent to inquire what injury resulted to the government from that act of legitimate defense. The absence of an accused person is no bar to the finding of an indictment against him, nor is it any hindrance unless the government wants to use him as a witness against himself. The injury claimed to have resulted from the dilatory proceeding of calling for a hearing in this case is that thereby the government lost an opportunity to find out through an early plea or demurrer or motion that the indictment already returned was defective, and the trial judge assumes that the purpose was to wait until the statutory bar had attached, and then "for some technical defect have the court rule on demurrer as it did in this case," etc. The record shows that the first plea of Greene and Gaynor before the commissioner was that the indictment No. 322 was bad on its face, and this was more than six months before the bar attached; and also, before the three years expired, Judge Brown on that very plea held the first eight counts of the indictment No. 322 bad on their face. The United States attorney attended the proceedings before the commissioner and before Judge Brown, and he was in due season as well informed and advised that his indictment was bad as he would have been if Greene and Gaynor had proceeded to Savannah and there filed their demurrer to the indictment. So that it seems to me that if the government was injured by the lawful demand for a hearing in New York it was the fault of the government officials, and not of plaintiffs in error.

But I have sufficiently outlined my views. I am convinced that indictment No. 322 charges only offenses for which the plaintiffs in error were not extradited; that indictment No. 371 not only and solely charges offenses for which plaintiffs in error were not extradited, but is barred under section 1044, Rev. St. U. S., and that indictment No. 476 is also barred under section 1014; and on these grounds, as well as others heretofore mentioned, that the judgment in this case should have been one of reversal.